Douglas J. Chermak (Bar No. 233382)
Email: doug@lozeaudrury.com
Michael R. Lozeau (Bar No. 142893)
Email: michael@lozeaudrury.com
Kylah M. Staley (Bar No. 347756)
Email: kylah@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
Telephone: (510) 836-4200

*Attorneys for Plaintiff Center for Community Action and Environmental Justice*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE, a California non-profit corporation,<br><br>Plaintiff,<br>v.<br><br>SOUTHWEST MOBILE STORAGE, INC., an Arizona corporation,<br><br>Defendant. | Civil Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.)** |

Center for Community Action and Environmental Justice ("CCAEJ" or "Plaintiff"), a California nonprofit corporation, by and through its counsel, hereby alleges:

## I. JURISDICTION AND VENUE

1. This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. §

1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2. On June 5, 2026, Plaintiff provided notice to Southwest Mobile Storage, Inc. ("Southwest Mobile" or "Defendant") of violations of the Act and Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the United States Attorney General of the U.S. Department of Justice; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board'); and to Defendant, as required by the Act. 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of CCAEJ's notice letter ("Notice Letter") is attached hereto as **Exhibit A**, and is incorporated by reference.

3. More than sixty days have passed since notice was served on Defendant and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g). This action is filed before the 120th day after the date on which CCAEJ's notice was given.

4. Venue is proper in the Central District of California pursuant to Section 501(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II. INTRODUCTION

5. This Complaint seeks relief for Defendant's discharges of polluted storm water from Defendant's industrial facility located at 9551 Lucas Ranch Road, Rancho

Cucamonga, California 91730 ("Facility"). These discharges and related procedural and planning omissions are in violation of the Act and *National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended by Order 2018-0028-DWQ in 2018 (effective July 1,2020)* ("General Permit"). Defendant's violations of the discharge, treatment technology, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

6. With every significant rainfall event, millions of gallons of polluted rainwater, originating from industrial operations such as the Facility, pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

7. The Santa Ana River Watershed (including Deer Creek, Cucamonga Creek, Mill Creek, and the Santa Ana River – hereinafter "Receiving Waters") are ecologically robust areas and important habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals, such as aluminum, iron, magnesium, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants harm the special aesthetic and recreational significance that Santa Ana area waters have for people in the surrounding communities. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

8. The State of California maintains a list of impaired waterways pursuant to

Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d). Reach 1 of Cucamonga Creek is impaired for cadmium, copper, lead, and zinc. Reach 3 of the Santa Ana River is impaired for copper, lead, pesticides, toxicity, and indicator bacteria.

## III. PARTIES

9. Plaintiff Center for Community Action and Environmental Justice is a nonprofit public benefit corporation organized under the laws of the State of California with its main office in Jurupa Valley, California. CCAEJ is dedicated to working with communities to advocate for environmental justice and pollution prevention. CCAEJ and its members are deeply concerned with protecting the environment in and around their communities, including the Santa Ana River Watershed. To further these goals, CCAEJ actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

10. CCAEJ has members living in the communities near the Facility, Deer Creek, Cucamonga Creek, Mill Creek, Santa Ana River, and the bordering parks and pathways, and use and enjoy the waters to which the Facility discharges storm water. Members of CCAEJ use and enjoy these waterways to participate in a variety of water sports and other activities including, but not limited to, fishing, boating, kayaking, bird watching, viewing wildlife, hiking, biking, wading, walking, running, and/or engaging in scientific study, including monitoring, restoration, and research activities. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.

11. Defendant's failure to comply with the procedural and substantive requirements of the General Permit and/or the Clean Water Act including, but not limited to, discharges of polluted storm water from the Facility, failure to report such pollution, and failure to act in accordance with the General Permit to improve the quality of storm water discharges from the Facility, degrades water quality and harms aquatic life in Receiving Waters, and impairs CCAEJ's members' use and enjoyment of those waters,

giving Plaintiff standing on behalf of its members.

12. Defendant's failure to comply with the procedural requirements of the Clean Water Act and General Permit means that CCAEJ's members are unable to obtain statutorily required information on Defendant's storm water, and storm water management practices. Thus, Plaintiff faces both informational harm and informational injury because the Clean Water Act and General Permit provide a right to information, but Defendant often has failed to provide such information, as detailed below. Further, such informational harm and injury gives Plaintiff standing on behalf of its members.

13. Defendant's alleged violations of the General Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests of CCAEJ's members have been, are being, and will continue to be adversely affected by the Defendant's failure to comply with the Clean Water Act and the General Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

14. CCAEJ brings this action on behalf of its members. CCAEJ's interest in reducing Defendant's discharges of pollutants into Deer Creek, Cucamonga Creek, Mill Creek, and Santa Ana River and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes. Litigation of the claims asserted, and relief requested in this Complaint does not require the participation in this lawsuit of individual members of CCAEJ.

15. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at CCAEJ.

16. Defendant Southwest Mobile is a California corporation. On information and belief, Southwest Mobile owns and/or operates the Facility.

## IV. <u>LEGAL BACKGROUND</u>

### A. The Clean Water Act.

17. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance

with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

18. Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

19. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

20. The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

21. The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. S*ee* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit a NPDES permit application. 40 C.F.R. § 122.21.

22. Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

23. Defendant is a "person" within the meaning of Section 502(5) of the Act.

*See* 33 U.S.C. § 1362(5).

24. A third-party enforcement action for injunctive relief is authorized under Section 505(a) of the Act. *See* 33 U.S.C. § 1365(a).

25. Each separate violation of the Act subjects the violator to a penalty of up to $69,733 per day per violation for all violations. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

26. Section 505(d) of the Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B. California's General Permit.**

27. Section 402(p) of the Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

28. Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

29. In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

30. The General Permit is a statewide general NPDES permit issued by the State Board pursuant to the Act.

31. The General Permit was issued on July 1, 2015 pursuant to Order No. 2014-0057-DWQ.

32. On November 6, 2018, pursuant to Order No. 2015-0122-DWQ, the State Board amended the General Permit to incorporate, *inter alia*, Total Maximum Daily Load ("TMDL") implementation requirements for waterbodies subject to TMDLs with contributions from industrial dischargers.

33. In order to discharge storm water to waters of the United States fully in California, industrial dischargers must secure coverage under the General Permit and comply with its terms, or obtain and comply with an individual NPDES permit. General

Permit, Finding #12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* General Permit, Finding #17.

34. Violations of the General Permit are violations of the Act. *See* General Permit, § XXI.A (Duty to Comply).

35. The General Permit contains certain absolute prohibitions. The General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* General Permit, Discharge Prohibition III.B.

36. In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing an NOI. Dischargers have been required to file NOIs since March 30, 1992.

### C. The General Permit's Requirement for BMPs that Achieve BAT and BCT.

37. The General Permit Effluent Limitations require dischargers covered by the General Permit to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. General Permit, Effluent Limitation V.A. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform.

38. Pursuant to the Act and the General Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); General Permit, Effluent Limitation V.A.

39. EPA's 2015 NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"), which are, in part, incorporated into the General Permit via the Numeric Action Levels ("NALs") set forth in Table 2. See General Permit, § XI.B (Monitoring, Sampling and Analysis).

40. The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented and achieve compliance with BAT and BCT standards. General Permit, Effluent Limitation V.A; See MSGP, Fact Sheet at 106; see also 65 Federal Register 64839 (2000).

41. The EPA Benchmarks for the following parameters are as follows: pH – 6.0 – 9.0 standard units; TSS – 100 mg/L; O&G – 15 mg/L; zinc – 0.26 mg/L; iron – 1.0 mg/L; aluminum – 0.75 mg/L; and nitrate plus nitrate as nitrogen ("N+N") – 0.68 mg/L.

42. The General Permit establishes annual NALs and instantaneous maximum NALs. The following annual NALs have been established under the General Permit: zinc – 0.26 mg/L; iron – 1 mg/L; aluminum – 0.75 mg/L; TSS – 100 mg/L; and N+N – 0.68 mg/L. An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. The General Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.

43. Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks or NALs indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the Facility.

///

**D. The General Permit's Receiving Water Limitations and Discharge Prohibitions.**

44. The Receiving Waters are ecologically sensitive areas, which provide an essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species, including rare and/or threatened aquatic species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special biological significance of the Receiving Waters. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

45. Receiving Water Limitation VI.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution or a public nuisance.

46. Discharge Prohibition III.C of the General Permit prohibits industrial storm water discharges and authorized non-storm water discharges ("NSWDs") that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance.

47. The Act and the General Permit's Receiving Water Limitations prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable Water Quality Standards ("WQS"). 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§122.4(d), 122.4(i), 122.44(d); General Permit, Receiving Water Limitation VI.A.

48. Receiving Water Limitation VI.B requires that dischargers ensure that storm water discharges and authorized non-storm water discharges do not adversely impact human health or the environment.

49. The General Permit does not provide for any mixing zones by dischargers.

The General Permit does not provide for any receiving water dilution credits to be applied by dischargers. Compliance with the Receiving Water Limitations is measured at a facility's discharge monitoring locations.

50. WQS establish the water quality goals for a water body. 40 C.F.R. §131.2.

51. WQS are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

52. Discharges in excess of WQS cause and/or contribute to impairment of the beneficial uses of the waters that receive polluted discharges.

53. The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan, called a basin plan, which contains WQS for water bodies within its geographical area.

54. The Santa Ana Regional Board adopted the "Water Quality Control Plan for the Santa Ana River Basin (Region 8)" (the "Santa Ana Basin Plan" or the "Basin Plan"). The Santa Ana Basin Plan identifies the "Beneficial Uses" of water bodies in the Santa Ana Regional Board's region, which includes the Receiving Waters.

55. The beneficial uses of these waters include, among others, groundwater recharge, water contact recreation, non-contact water recreation, warm freshwater habitat, wildlife habitat, rare, threatened or endangered species, and spawning, reproduction, and development. The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing and aesthetic enjoyment in conjunction with the above activities." Basin Plan, 3-3. Contact recreation use includes fishing and wading. *Id.*

56. Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of

the Act, 33 U.S.C. § 1313(d).

57. According to the current 303(d) List of Impaired Water Bodies, the Receiving Waters are listed for the following water quality impairments: Cucamonga Creek, Reach 1 – cadmium, copper, lead, and zinc; and Santa Ana River, Reach 3 – copper, lead, pesticides, toxicity, and indicator bacteria. Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already-impaired surface waters and aquatic-dependent wildlife that depend on these waters. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

58. Discharges of polluted storm water to the Receiving Waters pose threats to the public, dramatically affect the use and enjoyment of the surrounding environment, and adversely affect the aquatic environment.

59. Discharges of pollutants at levels above WQS, like those from the Facility, cause or contribute to the impairment of the beneficial uses of the Receiving Waters.

60. WQS may be either numeric or narrative objectives. Applicable WQS include, among others, the water quality objectives in the Basin Plan, and the "Establishment of Numeric Criteria for Priority Toxic Pollutants in the State of California" ("California Toxics Rule" or "CTR"), 40 C.F.R. § 131.38.

61. The Santa Ana Basin Plan provides the following numerical and narrative WQS that are applicable to the Receiving Waters:

- "Inland surface waters shall not contain suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses as a result of controllable water quality factors." Basin Plan, 4-19.
- "Waste discharges shall not result in coloration of the receiving waters which causes a nuisance or adversely affect beneficial uses. The natural color of fish, shellfish or other inland surface water resources used for human consumption shall not be impaired." *Id.*, 4-11.
- "Toxic substances shall not be discharged at levels that will

bioaccumulate in aquatic resources to level[s] which are harmful to human health." *Id.*, 4-20.

- "The concentrations of toxic substances in the water column, sediments, or biota shall not adversely affect beneficial uses." *Id.*
- "The pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors." *Id.*, 4-18.

62. The California Toxics Rule contains additional applicable WQS under the General Permit, the exceedance of which constitutes a violation of Permit conditions when contributing to a receiving water exceedance. *Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*, 2015 U.S. Dist. LEXIS 108314 at *21 (E.D. Cal. 2015); *see also* General Permit, Receiving Water Limitation VI.A.

63. The numeric WQS established in the CTR for freshwater for zinc is 0.12 mg/L (Criteria Maximum Concentration – "CMC") assuming a water hardness calculation of 100 mg/L.

64. The CTR numeric limits are expressed as dissolved metal concentrations.

65. Discharges with pollutant levels that cause or contribute to an exceedance of the CTR criteria, the Basin Plan standards, and/or other applicable WQS in the Receiving Waters are violations of Receiving Water Limitation VI.A of the General Permit.

66. Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation VI.B of the General Permit.

67. Storm water discharges and non-storm water discharges with elevated pollutant levels are violations of Receiving Water Limitation VI.C and Discharge Prohibition III.C of the General Permit.

### E. The General Permit's Storm Water Pollution Prevention Plan Requirements.

68. Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to continue, industrial

activities. *Id.*, § X.B. The SWPPP must meet all of the requirements of the General Permit. *Id.*, §§ X.A-H; *See also id.*, Appendix 1. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. *Id.*, § X.G.

69. The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. *Id.*, § X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. *Id.*, § X(C).

70. The SWPPP must identify applicable advanced BMPs that are not being implemented at the Facility and provide a justification for their exclusion. *Id.*, § X.H.4.b.

71. The SWPPP must include: a narrative description and summary of all industrial activity; potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and an identification and description of individuals and their current responsibilities for developing and implementing the SWPPP. *Id.*, § X.

72. The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id.*

73. The General Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the General Permit. *Id.*, §§ X(A)-(B). The General Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. *Id.*, §§ X(B), XV.

74. The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. *Id.*, §, X(B)(1).

75. The SWPPP requires a description of the discharge locations that will be monitored. *Id.*, § X.I.2.

**F. The General Permit's Monitoring Requirements.**

76. The General Permit requires permittees to develop and implement a storm water Monitoring Implementation Plan ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. *Id.*, §§ X(I), XI.

77. The General Permit requires facility owners and/or operators to develop and implement an adequate MIP that meets all of the requirements of the General Permit. *Id.*, §§ X(I), XI(A)-XI(D).

78. The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See Id.*, § XI.

79. An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility, and is evaluated and revised whenever appropriate

to ensure compliance with the General Permit. *See id*.

80. The General Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the General Permit. *Id.*, § XI(B).

81. Section XI(A)(1) of the General Permit requires dischargers to conduct monthly visual observations during dry weather of each drainage area. Monthly visual observations must include observations of any non-storm water discharges, all outdoor industrial equipment and activities, BMPs, and all potential sources of pollution.

82. Section XI(A)(2) of the General Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, odor in the discharge, and the source of any pollutants in storm water discharges from the facility.

83. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See id.*, § XI(A)(3).

84. The General Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. *Id.*, § XI(B)(4).

85. Section XI(B)(1) of the General Permit defines a Qualifying Storm Event ("QSE") as a precipitation event that produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area.

86. The General Permit requires dischargers to collect and analyze storm water samples from at least two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30). *Id.*, § XI(B)(3).

87. Storm water samples must be analyzed for, *inter alia*, TSS, pH, O&G, additional parameters identified on a facility-specific basis that serve as indicators of the

presence of all industrial pollutants identified in the pollutant source assessment, and those required under a facility's Standard Industrial Classification ("SIC") code. *Id.*, § XI(B)(6).

88. General Permit Section XI(B)(6)(e) requires that industrial dischargers analyze discharges for "additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix [portion of assessment of pollutant sources related to potential of aforementioned pollutions to be causing or contributing to applicable WQS]."

89. Section XI(B)(11) of the General Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days of obtaining all results for each sampling event.

### G. The General Permit's Water Quality Based Corrective Action Requirements.

90. Dischargers are required to perform certain actions when they determine that their industrial storm water discharges are in violation of Receiving Water Limitations. *Id.*, § XX(B)(1). They are required to perform the following actions:

- Conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP has been properly implemented;
- Assess the facility's SWPPP and its implementation to determine whether additional BMPs or SWPPP implementation measures are necessary to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations; and
- Certify and submit via SMARTS documentation based upon the above facility evaluation and assessment that: additional BMPs and/or SWPPP implementation measures have been identified and included in the SWPPP to meet the Receiving Water Limitations or applicable numeric effluent

limitations (“NEL”); or no additional BMPs or SWPPP implementation measures are required to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations or applicable NELs.

**H. The General Permit’s Permit Registration Document Requirements.**

91. A discharger seeking general coverage under the General Permit is required to certify and submit the following permit registration documents (“PRDs”): a completed NOI and signed certification statement, a copy of the site map from the SWPPP, and the SWPPP. General Permit, § II.B.1.b.i.

92. A discharger is required to submit a single set of PRDs for General Permit coverage for multiple industrial activities occurring at the same facility. *Id.*, § II.B.3.b.i

## V. STATEMENT OF FACTS

**A. The Facility’s General Permit Coverage.**

93. On March 14, 2023, the State Board processed Defendant’s NOI to obtain coverage under the General Permit for the Facility .

94. The Facility’s NOI identifies the operator of the Facility as Southwest Mobile Storage, with an address of 9551 Lucas Ranch Rd, Rancho Cucamonga, CA 91730. The State Board’s electronic SMARTS database lists the current Facility Waste Discharge Identification (“WDID”) number as 8 36I030139.

95. SMARTS lists the Facility’s coverage under the General Permit as “Active.”

96. The NOI lists the SIC code for the Facility as 3448 (“Prefabricated Metal Buildings and Components”).

97. According to the Facility’s SWPPP, it operates five days a week, Monday through Friday, from 8 a.m. to 5 p.m. (excluding holidays).

98. The Facility’s SWPPP lists the Facility size as 146,040 square-feet (or 3.35 acres), with 40, 606 square-feet (or 0.93 acres) of industrial area exposed to storm water.

99. According to the SWPPP, three drainage areas have been identified at the

Facility.

100. Plaintiff is informed and believes, and thereon alleges, that the Defendant is required to analyze its storm water discharges for zinc, iron, aluminum, TSS, pH, oil & grease, and N+N.

**B. Industrial Activities and Pollutant Sources at the Facility.**

101. Plaintiff is informed and believes, thereupon alleges the Facility engages in industrial activities such as storing, cleaning, maintaining, enhancing, and upgrading of intermodal containers.

102. Plaintiff is informed and believes, thereupon alleges that the Facility engages in industrial activities that are exposed to storm water including the maintenance and fueling of fleet vehicles, material unloading and product loading, painting, waste and scrap and handling, vehicle and forklift operations and fueling, fabrication and welding, metal cutting and storage, vehicle maintenance, hazardous waste storage, and intermodal container storage.

103. Plaintiff is informed and believes, and thereupon alleges, that the areas of industrial activity and industrial activities at the Facility are sources of pollutants.

104. Plaintiff alleges that Defendant has not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility.

105. BMPs are necessary at the Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events.

106. Plaintiff is informed and believes, and thereupon alleges, Defendant's failure to develop and/or implement required BMPs results in the exposure of pollutants associated with their industrial activities to precipitation, and results in the Facility's discharge of polluted storm water from the Facility into the Receiving Waters in violation of the General Permit and the Clean Water Act.

107. Plaintiff is informed and believes, and thereon alleges, that these illegal

discharges of polluted storm water negatively impact Plaintiff's members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

**C. The Facility's Storm Water Sampling Points and Discharges to the Receiving Waters.**

108. Plaintiff alleges that the Facility collects and discharges storm water from its industrial site through at least two discharge locations that are associated with industrial activity.

109. Plaintiff alleges that these two discharge locations at the Facility contain storm water that is commingled with runoff from the Facility from areas where industrial processes occur.

110. Plaintiff alleges that storm water discharges from the Facility flow into the San Bernardino County's municipal separate storm sewer system, which discharges into Deer Creek, which flows into the Reach 1 of the Cucamonga Creek, which flows into Mill Creek and then into Reach 3 of the Santa Ana River.

111. Plaintiff alleges that Deer Creek, Cucamonga Creek, Mill Creek, and the Santa Ana River are waters of the United States.

**D. Defendant's Violations of the General Permit's Receiving Water Limitations and Discharge Prohibitions.**

112. Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by Defendant demonstrate that discharges from the Facility contain concentrations of zinc that cause or contribute to a violation of the applicable WQS in the CTR. For example, storm water samples collected and analyzed by Defendant from the Facility on the following dates contained concentrations of zinc that cause or contribute to a violation of the applicable WQS in the CTR: February 1, 2024; February 13, 2025; and February 19, 2026.

113. Plaintiff is informed and believes, and thereon alleges, that storm water samples collected at the Facility's discharge points demonstrate that discharges from the

Facility contain pH values that cause or contribute to a violation of the applicable WQS in the Basin Plan. The Facility's storm water samples collected on the following dates indicate pH levels outside of the applicable range of pH set forth in the Basin Plan: February 1, 2024; and February 19, 2026.

114. Plaintiff is informed and believes, and thereupon alleges, that the aforementioned storm water discharges of zinc and pH in excess of numerical WQS as well as the elevated levels of iron and aluminum described in Exhibit 1 of the Notice Letter also cause or contribute to violations of the narrative toxicity standards in the Basin Plan.

115. Plaintiff is informed and believes, and thereupon alleges, that the elevated levels of iron in the Facility's storm water discharges described in Exhibit 1 of the Notice Letter also cause or contribute to violations of the narrative color standards in the Basin Plan.

116. Plaintiff is informed and believes, and thereupon alleges, that the elevated levels of TSS in the Facility's storm water discharges described in Exhibit 1 of the Notice Letter also cause or contribute to violations of the narrative solids standards in the Basin Plan.

117. Plaintiff is informed and believes, and thereupon alleges, that the aforementioned storm water discharges from the Facility in excess of applicable WQS adversely impact human health and the environment.

118. Plaintiff is informed and believes, and thereupon alleges, that the aforementioned storm water discharges from the Facility in excess of applicable WQS cause or threaten to cause pollution, contamination, or nuisance.

119. Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water Limitation VI.A of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

120. Each time discharges from the Facility adversely impact human health or the

environment is a separate and distinct violation of Receiving Water Limitation VI.B of the General Permit and Section 301(a) of the Act, 33 U.S.C. §1311(a).

121. Each time discharges from the Facility threaten to cause pollution or a public nuisance is a separate and distinct violation of Receiving Water Limitation VI.C of the General Permit and Section 301(a) of the Act, 33 U.S.C. §1311(a).

122. Each time discharges from the Facility cause or threaten to cause pollution, contamination, or nuisance is a separate and distinct violation of Discharge Prohibition III.C of the General Permit and Section 301(a) of the Act, 33 U.S.C. §1311(a).

123. Plaintiff alleges that discharges in violation of Receiving Water Limitations VI.A, VI.B, and VI.C, and Discharge Prohibition III.C have occurred on all dates listed in Exhibit 2 of the Notice Letter. These discharges are ongoing.

### E. Defendant's Violations of the General Permit's Requirement for BMPs that Achieve BAT and BCT.

124. Plaintiff is informed and believes, and thereupon alleges, that Defendant has not implemented BMPs that achieve BAT/BCT at the Facility in compliance with Effluent Limitation V.A of the General Permit.

125. Plaintiff alleges that storm water discharges from the Facility contain concentrations of pollutants associated with the Facility's industrial activities above EPA Benchmarks incorporated into the General Permit as NALs.

126. Plaintiff alleges that storm water discharges from the Facility contain concentrations of pollutants with exceedances of annual NALs.

127. The levels of zinc in storm water measured by Defendant at the Facility have exceeded the EPA Benchmark and the annual NAL for zinc of 0.26 mg/L established by the EPA and the State Board, respectively. For example, on February 19, 2026, Defendant measured a level of zinc of 3.6 mg/L from storm water discharged from one of the Facility's outfalls. That level of zinc is almost 14 times the EPA Benchmark and annual NAL for zinc. Defendant also has measured levels of zinc in storm water discharged from the Facility in excess of 0.26 mg/L in every sample it has collected from

the Facility since it obtained coverage under the General Permit, including the following dates: February 1, 2024; and February 13, 2025.

128. The levels of iron in storm water measured by Defendant at the Facility have exceeded the EPA Benchmark and the annual NAL for iron of 1.0 mg/L established by the EPA and the State Board, respectively. For example, on February 19, 2026, Defendant measured a level of iron of 100 mg/L from storm water discharged from one of the Facility's outfalls. That level of zinc is 100 times the EPA Benchmark and annual NAL for iron. Defendant also has measured levels of iron in storm water discharged from the Facility in excess of 1.0 mg/L in every sample it has collected from the Facility since it obtained coverage under the General Permit, including the following dates: February 1, 2024; and February 13, 2025.

129. The levels of aluminum in storm water measured by Defendant at the Facility have exceeded the EPA Benchmark and the annual NAL for aluminum of 0.75 mg/L established by the EPA and the State Board, respectively. For example, on February 19, 2026, Defendant measured a level of aluminum of 50 mg/L from storm water discharged from one of the Facility's outfalls. That level of aluminum is almost 67 times the EPA Benchmark and annual NAL for aluminum. Defendant also has measured levels of aluminum in storm water discharged from the Facility in excess of 0.75 mg/L in every sample it has collected from the Facility since it obtained coverage under the General Permit, including the following dates: February 1, 2024; and February 13, 2025.

130. The levels of TSS in storm water measured by Defendant at the Facility have exceeded the EPA Benchmark and the annual NAL for TSS of 100 mg/L established by the EPA and the State Board, respectively. For example, on February 19, 2026, Defendant measured a level of TSS of 2400 mg/L from storm water discharged from one of the Facility's outfalls. That level of TSS is 24 times the EPA Benchmark and annual NAL for TSS. Defendant also has measured levels of TSS in storm water discharged from the Facility in excess of 100 mg/L in every sample it has collected from the Facility since it obtained coverage under the General Permit, including the following dates:

February 1, 2024; and February 13, 2025.

131. The levels of N+N in storm water measured by Defendant at the Facility have exceeded the EPA Benchmark and the annual NAL for N+N of 0.68 mg/L established by the EPA and the State Board, respectively. For example, on February 19, 2026, Defendant measured a level of N+N of 3.8 mg/L from storm water discharged from one of the Facility's outfalls. That level of TSS is over 5 times the EPA Benchmark and annual NAL for N+N. Defendant also has measured levels of N+N in storm water discharged from the Facility in excess of 0.68 mg/L in nearly every sample it has collected from the Facility since it obtained coverage under the General Permit, including the following dates: February 1, 2024; and February 13, 2025.

132. Plaintiff alleges that the Facility's ongoing discharges of storm water with pollutants in excess of applicable NALs and EPA Benchmarks demonstrate that the Defendant has failed and continues to fail to develop and/or implement BMPs that comply with the General Permit's BAT/BCT standards.

133. Each day that Defendant has failed to develop and implement BAT and BCT at the Facility in violation of Effluent Limitation V.A of the General Permit is a separate and distinct violation of the Act.

134. On information and belief, Plaintiff alleges that the Defendant has been in violation of the BAT and BCT requirements at the Facility every day March 14, 2023.

### F. Defendant's Failure to Perform Water Quality-Based Corrective Actions for Violations of Receiving Water Limitations.

135. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to comply with water quality-based corrective actions ("WQBCAs") in violation of Section XX(B)(1) of the General Permit, including failing to conduct the required Facility evaluations, failing to properly assess the Facility's SWPPP, and submitting the required documentation to SMARTS since at least February 1, 2024.

136. During the 2023-2024 Reporting Year, Defendant reported two samples which contained levels of zinc exceeding the CMC of 0.12 mg/L for zinc set forth in the

CTR. During the 2024-2025 Reporting Year, Defendant reported one sample which contained levels of zinc exceeding the CMC of 0.12 mg/L for zinc set forth in the CTR. During the 2025-2026 Reporting Year, Defendant reported two samples which contained levels of zinc exceeding the CMC of 0.12 mg/L for zinc set forth in the CTR.

137. As a result of these Receiving Water Limitation violations, Defendant was required to perform WQBCAs for each time that the Facility was in violation of the General Permit's Receiving Water Limitations.

138. Defendant has failed to perform the required WQBCAs since it first demonstrated a violation of the General Permit's Receiving Water Limitations on February 1, 2024.

**G. Defendant's Failure to Submit Required PRDs.**

139. Plaintiff is informed and believes, and thereupon alleges that the Facility's NOI fails to include coverage for all industrial activities occurring at the Facility as required by the General Permit. *See* General Permit, § II.B.3.b.

140. The Facility's NOI and SWPPP fail to account for industrial activities related to maintaining and fueling fleet vehicles. Plaintiff is informed and believes, and thereupon alleges that either SIC code 4212 ("Local Trucking Without Storage"), 4213 ("Trucking, Except Local"), or 4214 ("Local Trucking With Storage") would be applicable depending on whether the Facility utilizes storage and the areas that the fleet vehicles service.

141. The Facility's NOI also fails to include SIC Code 3499, for "Fabricated Metal Products, NEC." This SIC Code pertains to the Facility's work in manufacturing fabricated metal products. All versions of the Facility's SWPPP since it has received General Permit coverage indicate that SIC Code is the applicable SIC Code for the Facility.

142. Plaintiff is informed and believes, and thereupon alleges, that Defendant is in violation of the General Permit and the Act each day Defendant operates the Facility without submitting a single set of PRDs for all of the industrial activities occurring at the

Facility. Plaintiff is informed and believes, and thereupon alleges that such violations are ongoing and have occurred daily since March 14, 2023.

**H. Defendant's Violations of the General Permit's Monitoring Requirements.**

143. Precipitation data obtained from the National Oceanic and Atmospheric Administration demonstrates that there were numerous QSEs at the Facility during the past few reporting years that Defendant failed to monitor.

144. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continue to fail to collect and analyze storm water discharge samples from all QSEs at the Facility as required by Section XI.B.3 of the General Permit as follows:

- Failure to collect and analyze two (2) samples from both outfalls during the second half of the 2022-2023 reporting year.
- Failure to collect and analyze two (two) samples from both outfalls during the first half of the 2023-2024 reporting year.
- Failure to collect and analyze a second sample from both outfalls during the second half of the 2023-2024 reporting year.
- Failure to collect and analyze two (2) samples from Outfall 2 and one (1) sample from Outfall 1 during the second half of the 2024-2025 reporting year.
- Failure to collect and analyze two (two) samples from both outfalls during the first half of the 2025-2026 reporting year.
- Failed to collect and analyze a second sample from both outfalls during the second half of the 2025-2026 reporting year.

145. Plaintiff alleges, that Defendant collected and analyzed storm water samples from a date that did not qualify as a QSE because it was not preceded by 48-hours with no discharge. On February 19, 2026, Defendant collected and analyzed a storm water sample and submitted it to SMARTS as a QSE. However, Plaintiff is informed and believes, and thereupon alleges that that date was not a QSE because storm events

producing discharges from the Facility occurred the three days prior on February 16, 17, and 18.

146. Plaintiff thus alleges that Defendant failed to collect and analyze storm water samples during the second half of the 2025-2026 reporting year in violation of the General Permit. These violations are ongoing.

**I. Defendant's Violations of the General Permit's Storm Water Pollution Prevention Plan Requirements.**

147. The Facility's SWPPP is publicly available via the SMARTS database and is dated July 29, 2026.

148. Plaintiff is informed and believed, and thereupon alleges that the SWPPP referenced in Paragraph 146 is the current SWPPP for the Facility.

149. Plaintiff is informed and believed, and thereupon alleges that Defendant has failed and continues to fail to adequately develop, implement, and/or revise the Facility's SWPPP in violation of SWPPP requirements of the General Permit.

150. Plaintiff alleges that the SWPPP fails to comply with Section X.G.2.b of the General Permit. The SWPPP fails to identify in the SWPPP any areas of the Facility where the minimum BMPs will not adequately reduce or prevent pollutants in the storm water discharge in compliance with Section V.A of the General Permit. CCAEJ alleges that all areas of the Facility are lacking in BMPs that will achieve that reduction or prevention. Defendant fails to identify advanced BMPs for those areas.

151. Plaintiff alleges that the SWPPP for the Facility fails to comply with the requirements of Section X.H.2 of the General Permit. The SWPPP fails to implement required advanced BMPs. The General Permit requires SWPPPs to identify applicable advanced BMPs that are not being implemented at the Facility and provide a justification for their exclusion. General Permit § X.H.4.b. Given the ongoing high levels of zinc, aluminum, iron, N+N, and TSS measured in the Facility's discharge, in order to comply with the General Permit's BAT/BCT requirement, the Facility's SWPPP must identify additional advanced BMPs necessary to implement the BAT/BCT requirements and

achieve NALs, and explain why available BMPs are not being implemented at the Facility. Defendant is violating Section X.H.4.b because the SWPPP does not identify applicable advanced BMPs that are not being implemented at the Facility and provide a justification for their exclusion.

152. Plaintiff is informed and believes, and thereupon alleges that the SWPPP fails to indicate that various activities that occur in Drainage Area B are industrial activities that are exposed to precipitation. This includes vehicles entering/exiting the Facility transporting raw materials, intermediate products, by-products, final products, and waste products (the only ingress/egress from the Facility is in Drainage Area B); machinery/trucks/vehicles that are potentially not adequately maintained driving in and out of the mechanic shop; potential mechanic shop activities with exposure to precipitation; vehicles exiting the mechanic shop; and vehicles tracking pollutants throughout Drainage Area B and out of the Facility. *See* General Permit §§ XVII.B.3-4; XVII.F.2.d-e; XVII.F.2.f; Appendix 2, A.B.4.d. The SWPPP fails to include said activities as well as Drainage Area B in the MIP.

153. Plaintiff further notes that to the extent that the SWPPP appears to claim that Drainage Area B is subject to the No Exposure Certification ("NEC") pursuant to the Permit, Defendant has not included an NEC Checklist in the SWPPP and the requisite certification statement. *See id.*, § XVII.E.1.

154. Plaintiff is informed and believes, and thereupon alleges that Defendant has failed to adequately revise the SWPPP in violation of Section X of the General Permit in response to ongoing high concentrations of pollutants and consistent exceedances of applicable NALs and water quality standards.

155. Each day the Facility has operated with an inadequately developed, implemented, and/or improperly revised SWPPP is a separate and distinct violation of the General Permit and the Act.

156. Plaintiff is informed and believes, and thereupon alleges, that Defendant has been in daily and continuous violation of the General Permit's SWPPP requirements

since at least March 14, 2023.

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of General Permit's Receiving Water Limitations and Discharge Prohibitions. (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))**

157. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

158. Plaintiff is informed and believes, and thereupon alleges that, within the applicable statute of limitations, storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards have and continue to be discharged each time storm water discharges from the Facility.

159. Plaintiff is informed and believes, and thereupon alleges that, within the applicable statute of limitations, storm water containing levels of pollutants that adversely affect human health and the environment have and continue to be discharged each time storm water discharges from the Facility.

160. Plaintiff is informed and believes, and thereupon alleges that, within the applicable statute of limitations, storm water containing levels of pollutants that cause or threaten to cause contamination, pollution, and nuisance have and continue to be discharged each time storm water discharges from the Facility.

161. Plaintiff is informed and believes, and thereupon alleges, that since at least March 14, 2023, Defendant has been discharging polluted storm water from the Facility in excess of applicable WQS for zinc, pH, narrative toxicity standards, narrative color standards, and narrative solids standards in violation of Receiving Water Limitations VI.A, VI.B, and VI.C of the General Permit.

162. Every day since at least March 14, 2023, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §

1311(a). These violations are ongoing and continuous.

**SECOND CAUSE OF ACTION**
**Failure to Implement the Best Available and Best Conventional Treatment Technologies in Violation of the General Permit.**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))**

163. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

164. Plaintiff is informed and believes, and thereon alleges, that Defendants has failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT in violation of Effluent Limitation V.A of the General Permit and the Clean Water Act, 33 U.S.C. § 1311(b). Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily violation of the General Permit and the Clean Water Act. General Permit, Effluent Limitation V.A; 33 U.S.C. § 1311(b).

165. Each day since March 14, 2023, that Defendant has failed to develop and implement advanced BMPs and BAT/BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

166. Defendant has been in violation of the BMP and BAT/BCT requirements every day since March 14, 2023. Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

**THIRD CAUSE OF ACTION**
**Failure to Perform Water Quality-Based Corrective Actions in Violation of the General Permit.**
**(Violations of Permit Conditions and the Act,33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))**

167. Plaintiff incorporates the allegations contained in the above paragraphs as

though fully set forth herein.

168. Defendant is required to perform certain actions when they determine that their industrial storm water discharges are in violation of Receiving Water Limitations.

169. Defendant has failed to conduct the required Facility evaluations, failed to properly assess the Facility's SWPPP, and failed to submit the required documentation to SMARTS

170. Every day since at least February 1, 2024, that Defendant has failed to complete the required water quality-based corrective actions in a violation of Section XX(B)(1) of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

171. Defendant has been in violation of the General Permit's water quality-based corrective action requirements every day since at February 1, 2024. Defendant continues to be in violation of these requirements each day that it fails to complete the required actions.

**FOURTH CAUSE OF ACTION**
**Failure to Submit Required PRDs.**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))**

172. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

173. Defendant is required to include coverage for all of the Facility's industrial activities by submitting a single set of PRDs for all said activities.

174. Defendant has failed to submit a single set of PRDs that include all applicable SIC codes related to all industrial activities occurring at the Facility.

175. Every day since March 14, 2023, that Defendant has failed to submit adequate PRDs is a violation of Section II.B.3.b of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

176. Defendant has been in violation of Section II.B.3.b of the General Permit every day since March 14, 2023. Defendant continues to be in violation of these requirements each day that it fails to complete the required actions.

**FIFTH CAUSE OF ACTION**
**Failure to Monitor All Qualifying Storm Events in Violation of the General Permit.**
**(Violations of Permit Conditions and the Act 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))**

177. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

178. Defendant is required to collect and analyze storm water samples from two QSEs within the first half of each reporting year and two QSEs within the second half of each reporting year.

179. Defendant failed to collect and analyze the required number of storm water samples during the 2022-2023, 2023-2024, 2024-2025, and 2025-2026 reporting years.

180. Every day since at least June 30, 2023, that Defendant has failed to collect and analyze the required number of storm water samples during a single reporting year is a violation of Section XI.B.2 of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

181. Defendant continues to be in violation of these requirements each day that it fails to complete the required actions.

**SIXTH CAUSE OF ACTION**
**Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the General Permit**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))**

182. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

183. Plaintiff is informed and believes, and thereupon alleges that Defendant has failed and continues to fail to develop, implement, and/or revise an adequate SWPPP for the Facility, in violation of the General Permit.

184. Defendant has failed to develop, implement, and/or revise an adequate SWPPP for the Facility. Defendant's ongoing failure to develop, implement, and/or revise

an adequate SWPPP for the Facility is evidenced, *inter alia*, by Defendant's failure to identify advanced BMPs at the Facility and justify the exclusion of advanced BMPs at the Facility, failure to implement required advanced BMPs, and failure to contain an adequate MIP that includes all drainage areas.

185. Each day since March 14, 2023, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility, respectively, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

186. Defendant has been in violation of the General Permit's SWPPP requirements every day since March 14, 2013. Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff prays judgment against Defendant as set forth hereafter and respectfully requests that this Court grant the following relief:

a. Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

b. Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c. Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d. Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e. Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f. Order Defendant to prepare a SWPPP for the Facility consistent with the

requirements of the General Permit and implement procedures to regularly review and update the SWPPP;

g. Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Clean Water Act and the Court's orders;

h. Order Defendant to pay civil penalties of up to $69,733 per day per violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1-19.4;

i. Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j. Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k. Award any such other and further relief as this Court may deem appropriate.

Dated: August 18, 2026 Respectfully submitted,

*/s/ Douglas J. Chermak*
Douglas J. Chermak
Attorneys for Plaintiff
Lozeau Drury LLP